Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 6979 | **DATE** | 10/25/2001 |
| **CASE TITLE** | Mobil Oil Corp. vs. Flores | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to the court's findings of fact and conclusions of law, judgment is entered in favor of Mobil Oil Corporation and against Ruben Flores in the amount of $167,592.10. Enter Memorandum Opinion and Order. Any pending motion in this case is terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | OCT 29 2001 | |
| | Notified counsel by telephone. | | date docketed | 29 |
| | Docketing to mail notices. | | docketing deputy initials | |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | 10/25/2001 | |
| | | | date mailed notice | |
| | MPJ | courtroom deputy's initials | 01 OCT 25 PM 4:00 | MPJ |
| | | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOBIL OIL CORPORATION, )
a New York corporation, )
)
Plaintiff, )
)
v. ) No. 99 C 6979
)
RUBEN FLORES, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

## FINDINGS OF FACT AND CONCLUSIONS OF LAW



### Findings of Fact

1.  Plaintiff Mobil Oil Corporation is a corporation organized and existing under the laws of the State of New York, maintaining its principal place of business in Virginia.

2.  Defendant Ruben Flores is an individual residing in Illinois and having a place of business at 5726 N. Nagle, Chicago, Illinois 60646.

3.  This Court has subject matter jurisdiction over Mobil's claims pursuant to 28 U.S.C. § 1332. There exists diversity of citizenship between the parties and the matter in controversy exceeds the sum of $75,000.00 exclusive of interest and costs. Venue is proper in this district.

4.  Beginning in 1991, Mr. Flores owned a service station located at 5726 N. Nagle, Chicago, Illinois.

5.  Mr. Flores sought to become a Mobil dealer and thereafter voluntarily entered into a Motor Fuels Franchise Agreement for N Dealers with Mobil on August 15, 1992.

6. The 1992 Agreement committed Mobil to sell and Mr. Flores to buy a minimum number of gallons of gasoline over the term of the Agreement.

7. The minimum number of gallons that Mr. Flores committed to buy was expressly set forth in the 1992 Agreement in terms of monthly and annual purchase requirements.

8. The 1992 Agreement contained a liquidated damage provision, which stated:

> <u>Liquidated Damages</u>. It is understood that Mobil is relying on sales to Dealer of the minimum product quantities set forth in Article II, Paragraph A, and that any repudiation of this Agreement and failure to purchase those minimum product quantities by Dealer will result in serious losses to Mobil. Dealer and Mobil acknowledge that the amount of those losses is and will be difficult to determine. It is agreed, therefore, that upon any repudiation of this Agreement by Dealer, Dealer shall pay to Mobil, as liquidated damages to compensate for such losses, two cents per gallon multiplied by the minimum number of gallons set forth in Article II, Paragraph A, measured from the time of repudiation to the end of the term of this Agreement. The damages here liquidated are confined to losses resulting from the Dealer's repudiation of this Agreement, and shall not affect such other rights and remedies as Mobil may have under this Agreement and under applicable law including, but not limited to, the PMPA and the Uniform Commercial Code.

9. Mr. Flores understood that under the 1992 Agreement, he committed to purchase a certain number of gallons of gasoline a year from

2

Mobil (his "quota") and that, if for any reason he decided that he no longer wanted to be a Mobil dealer, he had to pay Mobil two cents times the number of gallons that he had not met in his quota.

10. Prior to the termination of the initial 1992 Agreement, the parties executed another Motor Fuels Franchise Agreement for N Dealers (the "Franchise Agreement") on June 29, 1995.

11. The term of the Franchise Agreement was ten years.

12. The 1995 Agreement contained a requirement that Mr. Flores purchase a minimum amount of gasoline over the term of the Agreement and a liquidated damages provision that would take effect if he repudiated the Agreement before he had purchased this minimum requirement.

13. Article II, Paragraph A of the 1995 Franchise Agreement required Mr. Flores to purchase at least 70% of the gasoline quantities specified in the schedule attached as an addendum to the Franchise Agreement. The schedule specified that Mr. Flores was to buy at least 7,210,000 gallons of gasoline from Mobil over the ten years covered by the Franchise Agreement.

14. The liquidated damages clause provided:

Liquidated Damages. It is understood that Mobil is relying on sales to Dealer of the minimum product quantities set forth in Article II, Paragraph A, and that any repudiation of this Agreement and failure to purchase those minimum product quantities by Dealer will result in serious losses to Mobil. Dealer and Mobil acknowledge that the amount of those losses is and will be difficult to determine. It is agreed, therefore, that upon any repudiation of this Agreement by Dealer, Dealer shall pay to Mobil, as

liquidated damages to compensate for such losses, two cents per gallon multiplied by the minimum number of gallons set forth in Article II, Paragraph A, measured from the time of repudiation to the end of the term of this Agreement. The damages here liquidated are confined to losses resulting from the Dealer's repudiation of this Agreement, and shall not affect such other rights and remedies as Mobil may have under this Agreement and under applicable law including, but not limited to, the PMPA and the Uniform Commercial Code.

15. Mr. Flores understood that if he repudiated the Agreement in the middle of the 10-year term, he would owe two cents times the number of gallons that he had not purchased under his quota.

16. Mobil's refineries charge the retail marketing operations a transfer price which is very similar to the so-called "spot price" at which a company without refineries could purchase gasoline on the open market.

17. Mobil uses such a transfer price so that its marketing operations are not penalized by the fact that Mobil also operates refineries that may or may not be as efficient as other refineries in the marketplace.

18. Over the last few years, both the transfer and spot prices of gasoline have been volatile, undergoing substantial changes in short periods of time.

19. Mobil's dealer tank wagon ("DTW") prices constantly change in reaction to the prices charged by competitors in the market place.

20. From June 1995 to the present, the changes in competitive conditions in the market created significant swings in the DTW price of gasoline over short periods of time.

21. Because both the transfer prices and the DTW prices change substantially in short periods of time, it would be extremely difficult to predict future profits for gasoline sold to dealers over any significant period of time.

22. The two cents per gallon liquidated damages provision set forth in the Agreement with Mr. Flores is a reasonable estimate of the actual damages that Mobil would be entitled to from Mr. Flores.

23. The two cents per gallon liquidated damages provision set forth in the Agreement with Mr. Flores is on the lower end of the profits per gallon that Mobil would likely receive for the gasoline that Mr. Flores committed to purchase.

24. The remaining amount of gasoline that Mr. Flores committed to purchase over the term of his agreement was 4,584,248 gallons.

25. The liquidated damage amount of the 4,584,248 gallons not purchased by Mr. Flores at two cents per gallon is $91,684.96.

26. Throughout the time of his agreements with Mobil, Mr. Flores authorized Mobil to automatically withdraw funds from his bank account to pay for gasoline that he had ordered and Mobil had delivered to his station.

27. The 1995 Franchise Agreement indicates that Mobil may require dealers to prepay.

28. In approximately 1997, Mobil changed its method of delivering motor fuels to dealers to a system that automatically dispatched gasoline

tank trucks to deliver gasoline based on an assessment of the dealer's inventory as determined from daily inventory reports submitted by the dealer electronically.

29. Mobil's new motor fuel dispatch system is known as "MIMS" for Mobil Inventory Management System.

30. Mobil did not draft a dealer's bank account for gasoline delivered on the day of delivery, but rather several days afterward.

31. Because the MIMS system was automatically delivering gasoline based on an inventory assessment, Mobil could deliver several loads to a dealer before it drafted the dealer's bank account for the first load.

32. Because of the exposure of Mobil for nonpayment, Mobil went to a policy of requiring dealers to prepay for gasoline if they had five insufficient fund situations ("NSFs") within a 12-month period.

33. Mr. Flores understood that if he did not have sufficient funds in his bank account when Mobil automatically drafted his account, he would have to wire transfer the funds to Mobil for the gasoline that Mobil had already delivered.

34. Mr. Flores understood that Mobil had a rule that if he had too many situations where he did not have sufficient funds in his bank account, he would have to prepay for a load of gasoline by wire transferring the funds before Mobil would deliver gasoline.

35. In July 1999, Mr. Flores had five instances where he had insufficient funds in the bank when Mobil tried to draft his account for gasoline already delivered and, pursuant to Mobil's policy he was put on "prepay," requiring him to wire transfer funds to Mobil before Mobil would deliver gasoline.

36. Upon Mr. Flores' fourth NSF, Vickie Matthews, a Reconciliation Collection Analyst employed by Mobil, spoke to Mr. Flores and counseled him regarding Mobil's policy concerning prepayment.

37. In addition to failing to pay $5,004.40 for a load of gasoline that he received, Mr. Flores failed to pay a monthly statement in the amount of $1,647.56.

38. The monthly statement amounts reflect charges that the dealer incurs, which could include items such as credit card returns, taxes or equipment rental fees.

39. Mobil never refused to supply Mr. Flores with gasoline; it merely required him to pay by wire transfer in advance.

40. Mr. Flores understood that if he wire transferred money to Mobil, he would receive gasoline.

41. When Mr. Flores had wire transferred money for gasoline, Mobil had sent a truck to deliver gasoline right away.

42. Mr. Flores did not wire transfer any more money to Mobil. Instead, Mr. Flores took down all of the Mobil signs at the station and began to sell someone else's gasoline.

43. Subsequently, Mr. Flores sold his station to another dealer who now operates the station under the Citgo brand.

44. Article IX(A) of the 1995 Franchise Agreement provides:

<u>Trademarks, Brand Names; Advertising</u>. Dealer shall use Mobil's signs, trademarks, service marks and brand names to identify and advertise Mobil products and shall not use such signs, trademarks, service marks and brand names for any other purpose, or in any manner which may confuse or deceive the public. Dealer shall

not mix any other products with Mobil products or adulterate them in any way, and shall not use Mobil's trademarks, service marks or brand names in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products. Dealer shall keep legible and visible all Mobil signs and all Mobil names, trademarks, service marks, logos and signs on pumps, containers and equipment used to sell, dispense or store Mobil products, and shall use such pumps, containers and equipment solely for Mobil products.

45. Article I.C. of the 1995 Franchise Agreement provides as follows:

... Mobil has entered into this Agreement in reliance on ... Dealer's representations to Mobil of Dealer's desire to operate a retail service selling Mobil products.... Dealer shall exert his good-faith and best efforts to promote and maximize the sale of Mobil products....

46. Article II.A of the Franchise Agreement states in part: "Dealer shall use Dealer's good-faith and best efforts to maximize the sale of Mobil brand motor fuel at the Marketing Premises...."

47. Article IV.A of the Franchise Agreement states: "Dealer agrees ... to use good-faith and best efforts to maximize the sale of Mobil brand motor fuel at the Marketing Premises. Dealer shall not engage in any conduct at the Marketing Premises, by act or omission, which could detract from the sale of Mobil brand motor fuels at the Marketing Premises."

48. Contemporaneous with entering into the Franchise Agreement on June 29, 1995, Mr. Flores and Mobil executed a Reimbursement Agreement as an addendum to the Franchise Agreement.

49. The Reimbursement Agreement provides for a lump sum payment of $102,819.00 to be paid by Mobil to Mr. Flores to make repairs to and improvements to his service station facility.

50. The lump sum payment of $102,819.00 under the Reimbursement Agreement was paid by Mobil to Mr. Flores to make repairs and improvements to his service station facility.

51. The lump sum payment of $102,819.00 under the Reimbursement Agreement was made by Mobil in consideration for Mr. Flores' efforts to purchase 100% of the gasoline quantities specified in the addendum to the Franchise Agreement.

52. Mr. Flores' reimbursement of the lump sum payment of $102,819.00 under the Reimbursement Agreement was to be amortized completely over the life of the Franchise Agreement.

53. Pursuant to the Reimbursement Agreement, Mr. Flores was to pay back to Mobil on a cents-per-gallon basis.

54. The amount that Mr. Flores was paying Mobil under the Reimbursement Agreement was automatically drafted from Mr. Flores' bank account.

55. The Reimbursement Agreement provides that should the Franchise Agreement be terminated before Mr. Flores purchases 100% of the gasoline specified in the addendum to the Franchise Agreement, the remaining unamortized amount under the Reimbursement Agreement is immediately due to Mobil.

56. On June 29, 1995, Mr. Flores executed a promissory note in favor of Mobil in the amount $70,313.00.

57. Under the terms of the Promissory Note, Mr. Flores was to make additional payments of 1.5 cents per gallon on the price of gasoline purchased under the Franchise Agreement.

58. The Promissory Note contains an acceleration clause that provides that if Mr. Flores failed to timely make any payment due under the Promissory Note, the entire principal amount remaining on the Promissory Note became due immediately.

59. Under the terms of the Promissory Note, should Mr. Flores breach the Franchise Agreement, the entire principal would become due.

60. Mr. Flores failed to make his regularly scheduled installment payments due under the Promissory Note.

61. Mobil has complied with all of the terms of the Franchise Agreement and Reimbursement Agreement.

62. Article XIII, Paragraph D of the Franchise Agreement provides that the "Dealer shall pay Mobil's reasonable attorneys' fees and costs in the event Mobil sues successfully to enforce any of the provisions of [the Franchise Agreement]."

63. By failing to purchase the minimum number of gallons of gasoline specified in the Franchise Agreement, Mr. Flores has breached the Franchise Agreement.

64. As a result of Mr. Flores' failure to purchase the minimum number of gallons of gasoline specified in the Franchise Agreement, Mobil is entitled to liquidated damages in the amount of $91,684.96 in accordance with the terms of the Franchise Agreement.

65. By failing to purchase the minimum number of gallons of gasoline specified in the Franchise Agreement, Mr. Flores has breached the Reimbursement Agreement.

66. As a result of Mr. Flores' failure to purchase the minimum number of gallons of gasoline specified in the Franchise Agreement, Mobil is entitled to damages in the amount of $63,636.37, which represents the unamortized amount remaining from the lump sum paid by Mobil to Mr. Flores under the terms of the Reimbursement Agreement.

67. By failing to pay installments due under the Promissory Note and by failing to purchase the minimum number of gallons of gasoline specified in the Franchise Agreement, Mr. Flores has breached the Promissory Note.

68. As a result of Mr. Flores' failure to pay installments due under the Promissory Note and by failing to purchase the minimum number of gallons of gasoline specified in the Franchise Agreement, Mobil is entitled to damages in the amount of $12,270.77, which represents the outstanding balance on the Promissory Note.

69. Beginning in 1992, Mr. Flores received rebates from Mobil on his gasoline purchases.

70. No one from Mobil promised Mr. Flores that he would continue to get rebates during the entire time he was a Mobil dealer.

71. During the period from 1992 to June 1995, Mr. Flores considered the Mobil brand to be valuable because he believed it was one of the best gasolines, and he wanted to give his customers the best gasoline.

72. During the period from 1992 to June 1995, Mr. Flores understood that Mobil's prices were higher than the smaller brands like Citgo or Marathon or Phillips.

73. During the period from 1992 to June 1995, Mr. Flores felt that Mobil's prices were comparable to the good brands.

74. During the period from 1992 to June 1995, Mr. Flores felt that many people were concerned about the quality of the gasoline they put in their cars and therefore were willing to pay for a good quality gasoline.

75. Some of Mr. Flores' customers were attracted to the Mobil name.

76. Some of Mr. Flores' customers with Mobil credit cards would go out of their way to buy Mobil gasoline.

77. In 1992 when Mr. Flores entered into his first agreement with Mobil, he offered three grades of gasoline, regular, mid-grade and premium.

78. In 1992 when Mr. Flores entered into his first agreement with Mobil, Mr. Flores made the decision as to how to price gasoline at the station.

79. Mr. Flores would look at what the competition was doing in pricing gasoline to determine how he would price gasoline.

80. Mobil incurs costs in supplying motor fuel to a particular dealer.

81. Mr. Flores did not consider Citgo or Marathon to be the same type of competition as Mobil.

82. Mr. Flores considered Amoco to be a comparable competitor to Mobil.

83. Near Mr. Flores' station were two Amoco stations that Mr. Flores considered to be competitors.

84. Mr. Flores tried to match his prices to the prices at the Amoco stations all the time.

85. The prices that Mr. Flores charged at the pump to customers included taxes, in other words, it was an all inclusive price.

86. On July 31, 1992, Mr. Flores and Mobil entered into a Reimbursement Agreement pursuant to which Mobil advanced Mr. Flores the cost associated with making certain improvements at Mr. Flores' station as set forth in an attachment to the Reimbursement Agreement.

87. Pursuant to the July 31, 1992 Reimbursement Agreement, Mobil paid Mr. Flores a lump sum payment of $25,000.00 and made additional improvements at a cost of $11,500.00.

88. Pursuant to the July 31, 1992 Reimbursement Agreement, the total funds that Mobil advanced to Mr. Flores were to be paid back to Mobil at a rate of 1.738 cents per gallon purchased by Mr. Flores from Mobil over the term of the agreement.

89. During the period 1992 to approximately June, 1995, in addition to charging Mr. Flores for the gasoline that he bought from Mobil, Mobil was invoicing Mr. Flores an additional amount as an escrow for taxes.

90. Sometime in the summer of 1995 prior to entering into the 1995 Franchise Agreement, Mobil informed Mr. Flores that during the period August 1992 and September 1994, Mobil had invoiced Mr. Flores for taxes for DuPage County instead of taxes for Cook County, where Mr. Flores was located.

91. Mary G. Waldron wrote Mr. Flores a letter dated June 21, 1995 explaining the uncollected taxes problem.

92. Mr. Flores signed Ms. Waldron's June 21, 1995 letter indicating that he acknowledged and accepted the description of the events set forth in the letter and agreed to pay Mobil back over 60 months.

93. As a result of Mobil's incorrect invoicing, it undercollected taxes from Mr. Flores.

94. Despite undercollecting taxes from Mr. Flores, Mobil paid Cook County the correct amount, resulting in a difference of $70,313.00.

95. Mr. Flores' 1992 Franchise Agreement with Mobil required him to pay all taxes, including county taxes.

96. Mobil agreed to allow Mr. Flores to pay the tax underpayment over a period of five years.

97. Mr. Flores entered into a promissory note in order to repay Mobil for the tax underpayment over a period of five years.

98. On June 29, 1995, Mr. Flores entered into a second mortgage with Mobil.

99. When Mr. Flores entered into the Franchise Agreement, he considered that the Mobil brand had value for him.

100. When Mr. Flores entered into the Franchise Agreement with Mobil, he had customers who wanted the Mobil brand.

101. When Mr. Flores entered into the Franchise Agreement, he had long-term customers who used the Mobil credit card.

102. Mr. Flores' profits made at his station in 1995 were nine to ten cents per gallon on premium grade gasoline and about five cents per gallon on mid-grade gasoline.

103. As to regular gasoline, in 1995 Mr. Flores' profits would be about three cents per gallon when a customer paid cash or with a Mobil credit card. However, when a customer paid with any other credit card, Mr. Flores would not have made any money on regular gasoline.

104. When Mr. Flores entered into the 1995 Franchise Agreement, he considered that Mobil was entitled to make a profit on the gasoline that it sold to Mr. Flores.

105. When Mr. Flores sold more gasoline, he also sold more pop, cigarettes, or car washes.

106. On June 29, 1995, Mr. Flores signed a letter agreement authorizing Mobil to collect 1.5 cents per gallon from amounts invoiced by Mobil from gasoline sales to Mr. Flores as payment for the monies owed under the promissory note.

107. On May 1, 1996, Mr. Flores signed a letter agreement authorizing Mobil to collect an additional 2.0 cents per gallon from amounts invoiced by Mobil from gasoline sales to Mr. Flores as payment for the monies advanced to Mr. Flores under the Reimbursement Agreement for improvements, including the pumps and light pole.

108. On November 23, 1998, Mobil wrote Mr. Flores a letter indicating that because of new computer software that Mobil was required to install to address Y2K issues, Mobil would no longer be able to collect monies as part of the gasoline collection and would have to draft them from the dealer's account separately.

109. Mr. Flores received a certified letter from Mobil on or about July 22, 1999 stating that he was terminated as a dealer effective immediately.

110. Mr. Flores' notice of termination had a summary of the PMPA attached.

111. Mobil's requirements in Articles I.C, II.A, IV.A, IX.A and II.C of the Franchise Agreement were included in good faith and in the normal course of business, for a proper business purpose.

112. Mobil's decision to require Mr. Flores to prepay for gasoline was made in good faith and in the normal course of business.

113. Mobil's decision to require Mr. Flores to prepay was for the purpose of protecting it from losing money.

## Conclusions of Law

1. Mr. Flores repudiated the Franchise Agreement with Mobil dated June 29, 1995.

2. The contractual damages clause is an enforceable liquidated damages clause or an unenforceable penalty.

3. Mr. Flores is in default of the Reimbursement Agreement dated June 29, 1995.

4. Mr. Flores owes Mobil $63,636.37 under the Reimbursement Agreement.

5. Mr. Flores is in default under the Promissory Note dated June 29, 1995.

6. Mr. Flores owes Mobil $12,270.77 under the Promissory Note.

7. Mr. Flores owes Mobil $91,684.96 under the liquidated damages provision found at Article XII, Paragraph D, of the Franchise Agreement dated June 29, 1995.

8. Articles IX.A, I.C., II.A and IV.A of the 1995 Franchise Agreement are reasonable and of material significance to the franchise relationship.

9. The circumstances of Mr. Flores' removal of all of Mobil's signs and selling someone else's gasoline make it unreasonable for Mobil to provide 90 days notice of termination under Section 2804(b) of the Petroleum Marketing Practices Act.

10. Mr. Flores breached the 1995 Franchise Agreement by removing all of Mobil's signs and selling someone else's gasoline.

11. Mobil has not violated the Petroleum Marketing Practices Act.

### Conclusion

Pursuant to the Court's findings of fact and conclusions of law, judgment is entered in favor of Mobil Oil Corporation and against Ruben Flores in the amount of $167,592.10.

ENTER ORDER:

_____
Elaine E. Bucklo
United States District Judge

Dated: October 25, 2001